Cases No. 13-5018, PHOENIX MANAGEMENT, INC v. United States Mr. Dalsky, is that how you pronounce it? Yes, Your Honor. May it please the Court. I'm here on behalf of Phoenix Management. This is, of course, a procurement violation case and a denial of the bid protest at the Court of Federal Claims. You're not raising issues about the Procurement Integrity Act on appeal, right? No, not the PIA or the OCI. Okay. What you're saying is that there was a misrepresentation in the response to the solicitation, right? Yes, Your Honor. So, what was the misrepresentation that people had agreed to work for the bidder? Is that what it is? No, the misrepresentation that we have asserted through GAO and at the Court of Federal Claims was that the awardee did not have the permission to use the credentials for the individuals who they put in their proposal. Well, where did they represent that they did? They didn't. They didn't? The contracting officer investigates and finds that the three Phoenix employees provided verbal approval before ATS submits its proposal. On page 32 of your opening brief, you say that this finding and related descriptions contradict the contemporaneous notes taken during the interviews which do not confirm that the employees provided permission prior to, and you emphasize that, proposal submission. How does the failure in those notes to use those words prior to amount to a contradiction? The timing of when those three individuals that were interviewed gave permission to use their credentials is critical, at least in our opinion. And the reason why... But how is it contradictory? How are those notes contradictory? Because it doesn't say that the consent was given prior to. It just says, it's a temporal argument. The statements that the contracting officer was using to determine whether consent was given prior to was made after, of course, bid submission and after the initial award and during the context of corrective action. So, after all those things took place, what happened was the contracting officer went back to the awardee and said, can you tell me when, where, and how you got permission to use these credentials? There was the one paragraph boilerplate response that was given by all of these offerors or these proposed staff members that said, we have consented for the awardee to use our credentials in the proposal. The problem with that is we don't know if that consent was done in December when those statements were made, or was that consent done prior to bid submission, which we argue it wasn't. Wait a second. What statement did the bidder make about consent? It was 8... It's in 866. 866? Of the appendix. Yes, Your Honor. I'm sorry, 886, I apologize. These are the... Let's just look at those real quick. It's 884, 885, and 886 of the joint appendix. Well, I thought you were saying that the bidder made some representation in the response to its bid, to the government's bid about consent. There's no representation, right? I believe these three pages, 886, 885, and 884, is the awardee's response to the contracting officer's concerns about whether there was consent made with respect to these credentials. Wait, what's the misrepresentation here? The misrepresentation is that the awardee had permission to use... Where is that representation appearing about they had permission? The submission of the credentials themselves. The submission of the credentials? Yes, and remember an assertion... Why is that a representation that they had permission to submit the credentials? The credentials are public, are they not? Yes, they were. Well, so why is submitting the credentials a representation of they had permission? We believe the submission itself is an assertion that they had permission to use. Just kind of as a matter of law? Yes, under the restatement of misrepresentation. It talks about an assertion can be a statement that you just say orally, but an assertion can also be your conduct. Right, but what about the conduct? The conduct, the particular paper, papers actually, in which the proposed hires are discussed, it's just like questions, I guess, who don't contain a representation in Hike-Verba that these credentials were obtained voluntarily. They simply say, we propose to offer these positions to the incumbents as we're required to do. Right. Stop. What about, why is the manner by which they came by these credentials even relevant? I don't think the manner in which they came about it is relevant. Either voluntary or not voluntary. Well, then I do. If they're involuntary, I think that's a problem. I think the GAO case law has been pretty clear with respect to, look, you cannot just simply pull people off the internet, put them in your proposal, and represent to the government. But they didn't pull people off the internet. They made a specific representation, and it seems to me that they didn't go beyond what they knew, which was that they knew these people were working there. They fully intended to offer them positions. They didn't say that we're confident they're going to take them, right? There's nothing in there that says that. And we're obliged to offer these people these positions, and we're going to do so. Where is the untruth in that? That they had permission to use them? Each thing I said, I was careful to not include a representation, and oh, by the way, they gave us permission. Now, their statements would seem to indicate that the ones that they, the ones that you just referred to would seem to indicate that they did give permission in advance of the proposal. But what about the representation that suggests lack of permission? Okay. It's the representation. Or suggests permission. Okay. The representation is whether they had permission to use it. But that representation is not specifically made in this document, right? That's correct. Okay. Now, where then is it implicitly made? It's implicitly made based upon the case law that talks about, look, in order to have an even playing field in any type of procurement, we need to make sure that everybody competes on an equal basis. You cannot simply put people into your proposal that you didn't at least contact or at least have some permission to use their credentials. That's the misrepresentation. Which case says that? I mean, you're talking about these GAO cases, right? Yes, the four or five GAO cases. I've looked at some of those GAO cases, which seem to be quite different on their fact. Those are situations in which people affirmatively said, we won't go to work for the new contractor, or we refuse to give our credentials. We don't have that situation here. There hasn't been a statement that they would refuse to work for the new contractor. There's not even a statement that they refused to provide the credentials. Not with respect to the three individuals we were talking about, but with respect to the other two individuals. There was a specific representation that they put in a declaration that says, we didn't want to work for these people. Show me where that is. That is in... That's what their employer obtained from them after the fact. After the fact. Yes, this was part of the motion to supplement. It was a declaration that was attached to the complaint. And then the contracting officer is concerned enough to go and talk to them. And the contracting officer describes the interviews, and you say that his descriptions contradict his contemporaneous notes. And that bothers me intensely, because I don't think they do in the slightest. Okay, there's five people we're talking about. Right. Okay, three of them were interviewed. Two of them were not. They're complaining that two of them weren't interviewed. Where did the two who weren't interviewed say that they refused to provide their credentials? Those were the written declarations that were attached to the employer. Just show them. But those were not... Those two were not among the group of three that the contractor, that Phoenix initially said, you've used these three without their permission, right? The initial... As I understand, correct me if this is not correct. As I understand, Phoenix comes up and says, you have used three names improperly. And the CO goes and talks to those three people. No. Other... I would disagree. Okay, go ahead. Phoenix went in with five people. All right. They've always said five people. They had statements from three of them at that point. Yes, but the... The statements were only from three. The statements were... The CO talked to all those three, right? Correct. Okay. Because there was a disconnect between what we originally submitted and what the CO eventually found out in its OCI and PIA investigations. Okay, but you're now talking about the other two. You submitted declarations from the other two later on. Later on. And so could you show me where those two declarations... Yes. If you give me a moment, I'll do it. But it was attached. I can tell you, this is part of our motion to supplement. This was in May of 2012. That is correct, Your Honor. May 22nd or whatever. That is correct, Your Honor. All right. If you give me just a moment, I'll... Actually, I think... Yeah, those were signed on May 22nd, 2012. 1487... Right. Is that one of them? And 1489? That's correct.     Okay. And then there's a motion to strike following it. Yes. Those are the statements. Yes, 14 for the record. It is a 1487 and 1489. And the reason why... But this doesn't say what you said. Where does it say they refused to allow them to be used? It says, this declaration, again, confirms and clarifies, I never authorized the use of my licenses and certifications in any... That's a different statement. That's not a statement that they refused to allow them to be used, which is what you said was similar to the GAO cases. The GAO cases, they were contacted. They said, no, you can't use my credentials. There's no declaration here that that happened in this case. Well, other than these statements... Well, he said, I never authorized it. He doesn't say I refused. But I think that's the issue. The issue that we have presented is one where, look, if you're going to present credentials or resumes in your proposal, you had to at least go out and contact these individuals to say, can I do this? Because unless they're directly... GAO cases don't support that. Well, the GAO cases do. I would disagree. I would respectfully disagree. Which case? The aerospace case, the Mantec case, and I think the Augusta case. There is nothing in those particular... Those cases don't involve a simple failure to authorize use of the credentials. They involve situations in one of the cases where the person actually said, I will not work for the new contractor. And in the other case, they at least said, I was asked to provide my credentials and refused, leading to a potential inference that he wouldn't work for them. Well, I think our situation is a little bit more... It's a little worse. I don't want necessarily an offeror to hide behind the ball of not contacting people and then just submitting. I think what you're referring to, Your Honor, is, well, these people never really stood up and said, hey, look, all offerors out there, I don't want you to submit my credentials. I'm going to only submit my credentials under this proposal. Isn't a contracting officer determined that what really happened is that indeed they were contacted, at least the three people with whom he spoke, and gave their permission and then your client backed them off by going to them and getting those affidavits? The two declarations refer to the other. I don't want to mix the three. I'm not mixing them. Okay. I disagree because the other two weren't under our control. So I don't believe there's any evidence that the two that were not interviewed... I'm asking you about the three. Isn't it clear that what the contracting officer determines is that these folks who are working for your client are contacted by your client and backed off from their prior given permission? Isn't that what the contracting officer determined? Yes, based upon the three written statements and the interview. Yes. And I disagree with that. I still disagree with the contemporary notes that were made during the interviews and the subsequent determination by the contracting officer. Let me ask you a question, just if I may, just very briefly. What am I to do if I'm a follow-on? I want to bid on a follow-on contract. You've got the contract right now. I know I have an obligation to offer the position to your incumbent employees. So I say that. I say, I'm going to offer this position to the incumbent employees. The government doesn't say in the solicitation, you have to show us that they've committed. The government just says, who are your prospective employees? What more should I be required to do other than to say, I intend to offer the job to the prospective employees? I think it depends on each solicitation. Then suppose that the solicitation that I'm talking about is exactly this solicitation. What about this solicitation requires any more than what I just described? I would think you would need to contact those people individually. What in the solicitation says you need a commitment from those people? It says, it doesn't use the word commitment, and I would agree with you. That there is no language that you need to provide written commitments along with your proposal. I agree with that. However, based upon the context of the solicitation language itself, it says you need evidence that each proposed staff member met these requirements. In order to do that, you would necessarily need to go get resumes. If you're going to present those resumes and certifications, you at least need to get some permission from those individuals before you go off. Thank you, Mr. Zeltsman. Thank you. Thank you, Your Honor. May it please the court. The court should conclude that the Air Force evaluated... So the contracting officer interviewed three of these employees and reached a conclusion that they had agreed to let their resumes be submitted, or their credentials be submitted. But when the protester submitted these other two declarations from Garcia and Farr, he didn't go back and interview them in the light of this new evidence. And this matter was still before the contracting officer at that point. Why not? Why wouldn't he go back and interview the other two people? I think it's important to maybe briefly describe the history of the protest and what evidence... I think we all understand... Okay. So why not interview the other two people? Your Honor, I think the reason that the contracting officer did not interview the two URS employees at that point in the investigation after their statements were provided by Phoenix to the GAO on February 28, 2012, he had already determined by that point, or he already had the evidence before him. He had the statement from the president of ATS that the five incumbent employees had voluntarily provided their credentials and authorization to the contract manager. There was also the statement from the contract administrator for Santa Barbara Applied Research, the incumbent contractor, which confirmed the representations made by the president of ATS. And that statement is in the records. You're responding to my question of why not go interview the other two people since there seems to be a question about whether they had submitted these things, allowed them to be submitted or not. I think because he had a rational basis at that point in his investigation to decide based on the formal responses provided by ATS and Santa Barbara and the interviews with the three Phoenix employees where he interviewed them based on their conflicting statements from Phoenix and ATS. And Phoenix's own employees at that point had informed him during the telephone interviews on December 16, 2011, that they had voluntarily provided their credentials to ATS using his proposal, but that they signed the statements from Phoenix when the contract manager for Phoenix asked them to sign them and that they feared retribution from Phoenix and they feared for their jobs. So I think at that point when Phoenix's own employees told him that they had signed the statements for fear of retribution from Phoenix, if they did sign, that then two months later when Phoenix then submitted the two statements for the URS employees two months later, February 28, I think he had a reasonable basis at that point to decide that those later filed, those statements from URS employees lacked probative value and were incredible based on his conversations with PMI's own employees. That seems to me a little hard. I mean, you've got two different issues here. One, was there a representation? We've talked about that. There may not have been a representation in the first place, but if there was a representation for him not to follow through and interview the other two people seems a bit problematic. Your Honor, he did also have the statements from the two URS employees that were submitted by ATS on December 1, 2011 where the same URS employees said that they had voluntarily provided their credentials and authorization to the contract manager for use in ATS's proposal. So he did have their statements from December 1, and I think it was reasonable for the contracting officer to rely on the representations made in those statements and he had a reasonable basis to decide with respect to the first three. Well, he interviewed the first three based on their conflicting statements because at that point in his investigation Well, he ended up with conflicting statements from the other two also. That is correct, Your Honor. He did, after the initial protest submission in November, the response from ATS December 1, it is correct that in a supplemental submission February 28, PMI did finally provide the statements from the URS employees which contradicted their December 1 statements. That is correct. We have the May 22 statements of Farr and Garcia, right? Yes, Your Honor. Where are the earlier statements, the February 28 statements from... I do not have those pages immediately available. It is the... 878. 878? Those statements were dated February 23 and they were attached to 2012 and they were attached to Phoenix's submission to the GAO on February 28. I do not have those exact page numbers available. I do not think that is... Is the essence of your argument sort of falsest in omnia that if Phoenix had already... the contracting officer was entitled to determine that Phoenix had already solicited false statements from three employees that the other two would be the same? Your Honor, if I understand your question, I think our position is with respect to interviewing the two URS employees, whether he should have done that after February 28, that it was reasonable for him to decide at that point in the investigation that there was no reason to interview... That he knew that Phoenix had already solicited false statements from its three employees? Correct. That he had already interviewed the Phoenix employees on December 16, 2011 and they said they signed the false statements from Phoenix because they felt fear of retribution, fear of losing their jobs. And I think the court and the law provides discretion to the contracting officer to decide what information he needs, whether he needs to go then back and confirm information that's already been provided in the record. But the law also says, in general, that a prior effect can determine when somebody's lied once that they're going to lie again. That's correct, Your Honor. It's also important to note that the trial court here correctly concluded that the contracting officer's finding that the proposed staff members voluntarily allowed ATS to use their credentials and its proposal was reasonable and supported by the evidence in the record. And as I've detailed, there is evidence in the record to support that finding by the contracting officer that that finding survives rational basis review. And, Your Honor, if I can go back to your question about the handwritten notes very quickly. It's important to note that the contracting officer directly addressed Phoenix's allegation, that exact allegation, in a statement of facts filed before the GAO on March 28, 2012. And that's at appendix page 1034. And there, in a statement of facts, he stated that he had interviewed the two PMI or Phoenix employees in question and that they had told him that they had provided verbal authorization and copies of their credentials to the contract manager for ATS to use in his proposal, but that they could not remember the exact date and time. So, therefore, the exact date and time was not set forth in the contracting officer's determination and findings for the PIA investigation. So, he's already answered that. And also, PMI's argument, as Your Honor pointed out, is based on the absence of certain words from the contracting officer's handwritten notes. But the law does not require the contracting officer to transcribe by hand every word that is uttered during an interview of witnesses. And the absence of certain words from the contracting officer's notes certainly provides no basis to overturn the decision and set it aside as arbitrary and capricious. Let me, the timing here of the events, I'm trying to sort out. So, this went to the GAO once in December of 2011. And then went back to the contracting officer, right? Your Honor, I believe Phoenix's first submission to the GAO was November 11th. Right, but GAO made a decision at that point because of the government's willingness to take remedial action. They kicked it back and the government took further steps. The contracting officer then issues a decision, a final decision, right? Correct, Your Honor. And that is, is that the February 17th memo? Or is that memorialized in some other way? There was the determination of findings, which were... That was earlier. That was earlier, that was January 11th, 2011. Right, okay, all right. And then what does the document on February 17th at JA 1078, no, not JA 1078, at JA 905, what is that? The contracting officer's... The contracting officer has a memorandum for all interested parties. What is the nature of that document? What is the legal effect of that, if you know? I don't have that document in front of me, but I believe it's the... I have the appendix available. Your Honor, your question is about the legal effect of this document? Well, yeah, where I'm trying to go with this, just not to make it mysterious, is to try to figure out when this case essentially moved out of the hands of the contracting officer and into the hands initially of GAO and then ultimately of the court. Because it seems to me there may be some significance to the fact that the contracting officer makes his decision, final decision, there's a protest. That protest shows up, I think, on JA 921 for February 27th, right? Correct, your Honor. And that protest is the point at which these statements are attached to the protest, right? That is the first time that there are statements attached from the two URS employees. Right, and my question is, can the contracting officer at that point say, well, I'll just give these two guys a call? Or is the contracting officer done when he has entered his final decision in the case, which is subject to the protest? Your Honor, we contend that it was reasonable at that point, after he concluded his investigation, and based on his interviews, in particular of the three Phoenix employees, where they had said that they feared retribution if they didn't sign the statements from Phoenix, that at that point in the investigation, after the conclusion of the investigation, so when Phoenix then filed their supplemental protest or their protest on February 27th or 28th, that he had a reasonable basis to decide that those statements from the URS employees were of no probative value and that they were probably derived in the same manner. My question is, did he have the authority? Could he have said, the protest raises these two statements. I'll just get on the phone and call these guys and supplement my decision. Would he have had the authority to do that while this case was pending on protest before the GAO? He certainly had that authority, Your Honor. He could. Yes, and we contend it was reasonable for him to resolve the conflicts and the statements that were submitted for the Phoenix employees by ATS and Phoenix. I'm talking about the February conflict. Right, and I'm saying it was reasonable for him to resolve that conflict initially that arose in November and then December 1st. So it was reasonable for him not to interview the other two employees whose February 23rd statements had now been submitted. Yes, I think at that point, after he concluded the investigation, he had the other evidence. He had the URS employees' December 1st statements. He had statements from the ATS president, the SBAR, San Barbara contract administrator, that the totality of that evidence and the interviews with the Phoenix employees themselves indicated that these February 28th statements or February 23rd statements were derived in the same way through pressure from Phoenix and or URS to sign these statements for fear of losing their jobs and or losing the opportunity to work on the resulting successor contract. So what you're saying, I just want to make sure of this because it seems a little counterintuitive, but I'm sure you know this area better than I do. You're saying that the contracting, if I understand you correctly, that the contracting officer could have, had he chosen, gone ahead after the protest was filed and have decided, I need to do some more investigating in this case. Let me just call these folks. Let me do this, that, and the other, and I'll just submit some supplemental evidence to the GAO in the GAO proceeding. That would have been within his authority to do. He doesn't lose, in effect, jurisdiction to create and submit additional evidence after the case goes to the GAO. I think the contracting officer could have done that, Your Honor. Is there? I don't know if there's any statutory provision, since the investigation for the PIA and OCI had concluded. I don't know if that could be reopened. I don't know that, but all right. That's fine. In any event, it's important to note that we believe that Phoenix has not met its heavy burden to show that the contracting officer's decision not to interview the two URS employees, after he concluded his investigation, after he received their conflicting statements on February 28th, lacked a rational basis or was unreasonable. Well, Chris, there's another issue here, and that is whether there was a representation in the first place that they'd supplied their credentials voluntarily. Your Honor, it's our position that the record shows that Alliance Technical Services accurately represented its intention to hire so even if they didn't give them the credentials voluntarily, you still win. Yes, Your Honor, that's correct, particularly because there's also the trial court's finding or conclusion that the contracting officer's finding that all five incumbent employees had voluntarily allowed ATS to use their credentials was supported by the SBA. Do you lose if we conclude that there's an issue of fact with respect to the voluntariness? Well, Your Honor, there was nothing. I don't believe so because there's nothing in the solicitation that required evidence of commitment. There was no requirement that an offer describe the level of commitment of their proposed employees. There was no requirement that an offer only proposed current on-staff personnel. There was no requirement of commitment letters or employment contracts or letters of intent. You're just required to make the offer. We were correct to make the offer, and particularly because they had received, the evidence shows that they had received the statements from the employees and the verbal authorization, or I'm sorry, received the photocopies of the credentials and verbal authorization, that ATS also had a reasonable basis to believe that these individuals would be available, these incumbent employees would be available to continue to work on the successor contract. But I think the central issue, Your Honor, is that ATS accurately represented its intention to hire these employees. And although this is not in the record, it's my understanding from the contracting officer and agency counsel that, in fact, each of the five incumbent employees at issue here were hired by ATS to work on the successor contract, and they did all start working on the contract. Excuse me. Okay, thank you. One other question before you. Why is the record sealed here in the Court of Federal Appointments? Is there any confidential material in that record? Your Honor, I believe that the record was sealed particularly at the direction or the request of appellant with respect to proposal information, source selection, sensitive information. But it's my understanding that the trial court only redacted the names of the individuals to protect their identities. So the rest of it's not sealed? I don't believe so, Your Honor. No, Your Honor. Okay. Well, I'll respond to that. All right. If the court has no further questions, we respectfully request the court affirm the trial court's decision. Thank you. Your Honor, very quickly, with respect to the reason why it was sealed, at GAO there was a protective order issued that blocks the public release of any type of source selection, sensitive information, evaluation notes, so forth. That order gets carried over, so to speak, to the Court of Federal Claims. And so we continue, we're under an obligation, both of us, the United States, as well as counsel, we're obligated to keep certain things restricted from public distribution. So the whole record is not sealed? The whole... I want to make sure I answer your question. The whole record, I would think, is sealed. But we have redacted all the briefs to be able to... What's the basis for sealing the whole record instead of just deleting the confidential information? Well, I want to make... I'm a little bit confused. When I say sealed, Your Honor, the file is sealed, but only certain portions of the file cannot be released to the public. So procedurally, we seal everything, and then we deal with redacted versions back and forth to be able to make certain parts of the file. So somebody, a member of the public, wants to get access to this record other than the redacted portions. They can go to the Court of Federal Appliances and get... Yes. Because there's redacted versions there, yes. Okay. Okay. Your Honor, I want to address real quick the handwritten notes, and I want to complete a thought. And that is, it was the leap that the contracting officer made after taking the interviews of the three individuals that we had concerns with. The CO goes in, he interviews these individuals based upon the boilerplate statements that they provided. And if you look at the handwritten notes, it doesn't specifically say that the consent was given prior to this submission. Okay? That was our concern with the contemporaneous notes and the specific findings that the contracting officer made. He said specifically, based upon my interview, they provided consent prior to bid submission, but there's nothing in the notes that say that. Secondly, probably the most glaring disconnect between the handwritten notes and his conclusions is he says one of the individuals actually talked to a Mr. Brown. Well, in his handwritten notes, it's clear that this individual never talked to Mr. Brown. So there's a disconnect between his hand notes the boilerplate statements and the ultimate findings that there was consent made prior to bid submission. With respect to your initial question to the government, the answer is pretty clear as to the reason why the CO didn't interview these two people. And that was he didn't believe those two people were challenged in the original protest. And that's found at A1030. There's a specific reference. He says, look, I'm not going to go interview these people because you didn't challenge these two people in your original protest. Even the trial court found that to be a mistake. Even the trial court said in their opinion that was wrong. They were challenged and probably the contracting officer should have went and interviewed those people and did not. With that, I think I'm done. If you've got any other questions, I'm done. Okay. Thank you very much. Thank you very much. May I be excused? Yes. Thank you. The case is submitted. We thank both counsels.